Filed 5/1/15  P. v. Mora CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RAMON GUADALUPE MORA,<br><br>    Defendant and Appellant. | H040454<br>(Santa Cruz County<br>Super. Ct. No. F22812) |

Defendant Ramon Guadalupe Mora was convicted by a jury of 11 crimes against "Jane Doe," with whom he had had an intermittent dating relationship.  On appeal, he contends that insufficient evidence supported the verdict on eight of those offenses: infliction of corporal injury on a former cohabitant, forcible rape, an attempted criminal threat, assault by means likely to produce great bodily injury, kidnapping, and three counts of felony false imprisonment.  Defendant further asserts error in the trial court's denial of his motion to sever some of the charges for trial.  We find no merit in defendant's arguments and therefore will affirm the judgment.

### Trial Evidence

At the time of defendant's crimes, Jane Doe was a student at the University of California at Santa Cruz (UCSC), having started there in the fall of 2009.  Defendant was also a student at UCSC.  In April of 2010 Jane and defendant began dating, and by May their relationship was exclusive.  In October of that year, Jane broke off the relationship "because he had a hard time letting go of . . . things that happened in the past and also he was kind of . . . jealous and I just didn't think we were that compatible so I thought to

break it off." Defendant, however, "did not take it well." He began showing up at her on-campus apartment and at her classes. On one occasion in early November he confronted her in a stairwell of her apartment building, blocked her path, and pushed her up against the building, while insisting that they needed to get back together. After that incident Jane sought out a residence hall supervisor, who set up a mutual no-contact agreement.

On November 9, 2010, defendant confronted Jane after one of her classes and demanded money for a T-shirt that had apparently disappeared after she tried to return it to him by leaving it outside her door.[1] When Jane said that she did not have any money, he grabbed the back of her arm and pushed her forward toward a plaza so that she could withdraw money from an ATM. After she handed defendant the cash (thus completing the act charged as grand theft in count 1), she started to leave, but he insisted on taking a walk, and he again held onto her arm as he guided her along a path toward the library. His grip on her arm hurt her both times. On the way defendant suggested that if she had sex with him he would leave her alone. She said no; and when he tried to kiss her, she bit his lip. Defendant became upset; he grabbed a bag containing her school papers and notebooks and threw it into a ravine. By pressing the "last call" button twice on her cell phone she was able to call her friend Spencer Koobatian; she then talked to defendant loudly and mentioned her location, thus conveying to Spencer where she was. He and another friend, James Ramsey, went to her aid. Jane was "shaking [and] looked very afraid. She didn't want to be touched . . . and she was on the verge of tears."

Around the new year defendant "texted" Jane on her old phone, telling her that every 30 minutes she had to text him and let him know where she was. Jane did not receive that message or comply; her parents had given her a new phone, and she had

---

[1] Jane later saw defendant wearing that very shirt on campus.

changed her number because defendant "wouldn't stop harassing [her] and he would send [her] multiple text messages or call [her] multiple times within an hour."

On January 6, 2011, the events occurred that led to count 2, the first charge of false imprisonment by violence. Jane spotted defendant near a building on campus, and to avoid his "harassing" her, she tried to cut through a nearby parking structure. Defendant, however, came up behind her and forcefully grabbed her arm, pinching it. He told her they needed to talk and led her off behind the building. Defendant yelled at Jane, insisting that she had "ruined his New Year's Eve" because she had not texted him every 30 minutes. He told her that he had called her old phone and her mother had answered, and the two had some kind of conversation that seemed "negative." At that point defendant led Jane into a secluded part of the woods and she was unable to get away from him; when she tried, he grabbed her arm, at times "pretty forceful because there w[ere] a couple of times when [she] got knocked down." Defendant told Jane again that if she had sex with him he would leave her alone. Jane said no, but when she tried to get away again, he put his arm around her waist and tried to put his hand down her pants. Jane pulled his hand away. Defendant then went through her bag and discovered her new phone. He called his own number with it so that he would have her new phone number.

During this incident Jane was crying. A bicyclist below them heard her and called up to them to ask if everything was okay. Defendant said it was, but Jane was standing behind him and shook her head no. The bicyclist approached them and asked what was going on. Defendant tried to persuade him to leave, but the bicyclist was not convinced, so he walked with the two to the residence hall supervisor, who referred them to Doug Zuidema of the "judicial affairs department." Defendant later told Jane to tell the supervisor that she had been "making things up" so that he would not have to face Zuidema.

Almost two weeks later, on January 19, 2011, defendant began sending Jane text messages and unanswered phone calls in one day—more than 25 missed calls and almost

3

300 text messages on that day alone. Between that day and May 25, 2012, defendant continued this behavior—which, together with a pattern of harassment and threats of harm, led to the stalking charge in count 3.[2]

On February 3, 2011, the events that occurred led to count 4, the second charge of false imprisonment by violence. With the no-contact agreement in place, Jane headed to class to participate in a debate. On the way there, defendant approached her from behind and began talking to her, urging her to do something, to tell Zuidema she had lied, or he would get "kicked out of school." Defendant snatched her notes away from her and left. Jane had to find a printing lab to reprint her notes, making her late for class. At trial Jane did not recall defendant's pinching her arm on this occasion, but in the evening after the incident she sent an e-mail to Zuidema relating defendant's grabbing her arm and pulling her behind a nearby building.

In April 2011, defendant told Jane that he was "getting on track in school" and getting counseling for his anger. He asked Jane to get back together with him. She agreed to resume the relationship because he seemed to be making an effort to change. During the summer of 2011, while her friends were away from Santa Cruz, Jane had a temporary apartment, but she spent about five nights a week at a house defendant shared with friends.

On November 12, 2011 defendant had insisted on picking Jane up from campus after a performance she was attending. As she was waiting for him, he called to tell her that he had been in a car accident and needed her. When she arrived at the scene, she discovered that it was only a minor fender bender; defendant had "made it sound [as if] it was a lot worse than it was." They went in defendant's car to his home, where defendant

---

[2] On appeal defendant does not dispute the evidence supporting his conviction of stalking.

4

got upset at Jane, yelling at her because, he said, the accident was her fault. He also blamed her for losing the paper on which he had written down the other driver's license information, though he had never given her that paper. Defendant started slapping Jane in the face, shoving her against the wall, and pushing her up the stairs, leaving her with bruises on her arms. Jane said that this was "not okay" and she wanted to break up. That upset defendant more, and his "physicality" increased. He continued yelling at Jane, insisting that "oh, no, we're not going to break up, like that's . . . not going to happen." He told her that she was not going to leave his room; as soon as she got close to the door he would pull her back or block her way. When she tried to call her friend and roommate, Samantha L., he pulled the phone away from her. These events resulted in the misdemeanor charge in count 5, corporal injury on a former cohabitant.

The next morning defendant told Jane that she had to stay in his room while he was at work; she "[had] better" be there when he returned. After he left, Jane left a note for defendant, saying she did not want any more contact with him, and she asked Samantha to pick her up. That evening as she was home in Santa Cruz with friends, defendant came to the front gate and knocked. As Samantha went out to talk to him, Jane hid in the house. After Samantha returned, defendant began pounding on the gate, breaking it, and on the windows and front door of the house. Although the deadbolt of the door was engaged, Spencer and James had to hold it against defendant's ramming it with his body weight. From her hiding place Jane could not hear what defendant was yelling, but she later learned that he had threatened to kill her. The report upset and scared Jane, but she was not sure if he was capable of carrying out the threat. This incident formed the basis of count 6, an attempted criminal threat. Afterward her friends began walking with Jane to class and to work. Nevertheless, defendant approached her and demanded that she fix the trespassing ticket he had received for his conduct.

Jane and defendant resumed their relationship in late November of 2011. Jane explained, "I didn't know what to do anymore and I felt that it would be easier to just be

5

with him because . . . I didn't like that he wouldn't leave me alone and there was nothing I [could] do to make him stop. And I didn't know how to handle the situation because I didn't want him to get in trouble but I also didn't want him to keep harassing me."

Samantha, however, along with Jane's other housemate, Emma B, pursued a restraining order against defendant. On December 2, Jane accompanied defendant and sat with him at the hearing, out of fear "of what would happen if [she] didn't do what he wanted [her] to," but the court issued the order anyway. Afterward defendant began yelling at Jane for not doing enough to oppose the order, and he ordered her to move out of the house she shared with Samantha and Emma. At his direction she called the property manager to ask how she could get out of the lease; when that was unsuccessful, defendant shoved her.

Defendant struck or threatened Jane on other occasions during the period between November 2011 and April 2012. On her 21st birthday in March 2012 he slapped her and did not allow her to leave his place after dinner. On another day early that year he threatened her with a padlock if she did not stop crying. At least twice he pinched her nose closed so she could not breathe. She recalled one occasion on which he choked her with one hand.

On May 4, 2012, Jane called him to say she did not want to see him anymore. The next day he persuaded her to come to his house to talk face to face; he had said that otherwise he would come to her house notwithstanding the restraining order, and she "didn't want him to get in trouble." Defendant promised her that after they talked he would let her leave. But once there he started yelling at her; he broke her sunglasses in half and insisted that they were not going to break up, that "it wasn't going to happen." Holding a pair of scissors, he threatened to cut her dress off if she tried to leave. Eventually he released her that day, but during the rest of that weekend he left multiple voice mail messages on her phone, taunting her with references to her family background and calling her names.

6

On May 7, 2012, Jane was at home with Samantha and Emma when defendant called her to see why she had not contacted him about getting together. Jane said she was "serious," that she wanted to break up. She told him not to contact her. But five to 10 minutes later he began pounding on the windows of the house. Jane hid while Samantha called the police. That incident led to the misdemeanor charge in count 7, for disobeying the restraining order.[3] Jane sent e-mail messages to professors, the director of her internship, the girl for whom she babysat, and the girl's mother, telling them that she had to stay home for a couple of days. Jane knew that if she went through her routine, defendant would intercept her and "something would happen."

For the next two weeks defendant did not contact Jane. Late at night on May 24, however, she received a couple of text messages and a phone call or two. They made her "scared and nervous because [she] knew something would happen." The next morning, May 25, Jane was at her job on campus when she saw defendant walk back and forth multiple times in front of the office. At one point he stood in front and stared at her. When she was finished she left through the back so she would not run into defendant on her way to class. By this time she had received about 10 phone calls, which she did not answer, and 20 text messages from defendant, saying they "needed to talk, that he had . . . something important to say." Jane was able to attend her next class until 1:40 p.m. and her internship until 3:00 p.m. When she left, she was intending to pick up Fiona, the girl she babysat for, at Fiona's elementary school and take her home and then to her swim practice at 5:00 p.m.

As Jane was walking along a path to the elementary school, however, defendant approached her on a bicycle. He said that he had given her a couple of weeks to cool down and that they had not broken up. Jane told him that they had, and she reached into

---

[3] Defendant does not contest the conviction on that count.

7

her backpack for the key chain on which she had been keeping pepper spray in case she ran into him. Defendant took the pepper spray away and threw her keys down the path, but kept the key to Fiona's house. As she bent down to retrieve her other keys, defendant forcefully pulled her backpack off her and put it on himself. Jane asked him to return the key to Fiona's house. Defendant told her he would keep her belongings and pick her up when she finished babysitting. He gave her back the key to Fiona's house but kept her house key and other belongings, including her cell phone. When Jane protested, he told her "there was no choice, that he was going to pick [her up] after[ward]." He told her to call her own phone to tell him where to pick her up. Jane agreed just so she could reach Fiona in time.

Later, as she was leaving Fiona's house, defendant drove up behind her. Leaning over to the passenger side, he grabbed her wrist and yelled at her to "get in the fucking truck now." Jane was afraid of what he might do if she ran away, so she got in the truck. As he drove away he yelled at her; he told her he had gone through her phone and discovered that she had disobeyed his order not to be friends with Samantha, Emma, Spencer, and James. Defendant began slapping her arms. Jane repeatedly tried to get out of the car, but defendant prevented her by grabbing her arm or sweater, pulling her back, and re-locking the door. At one point, crying, she mouthed "help" to a woman in a van nearby, but then defendant hit or shoved her "really hard" so that her head hit the window. He pulled her hair and pushed her face down so that she could not make eye contact with other drivers. He told her that if she continued trying to make eye contact, things were "just going to get worse," so she'd better keep her head down. Jane started panicking when defendant told her he was driving her to Watsonville, because she did not know what he was planning to do with her. At one stoplight Jane took off a shoe and tried to hit defendant with it, but he took it away from her.

As defendant drove he kept asking whether they were still together and whether she still loved him; but each time Jane said no, he hit her. Eventually she started

8

answering yes, they were still together and she did love him. Defendant stopped hitting her then. Later he told her that he had wanted to leave her naked in Watsonville to be raped; then he would find her disgusting and be able to move on.

Defendant stopped for about five minutes at an elementary school. After they had both calmed down he returned to his house in Santa Cruz. Although she saw two men in front of the house, she was scared, exhausted, and ashamed, so she did not ask them for help. She did not try to run, because she had never succeeded in escaping before. Defendant took her inside his room, locked the door, and put a towel under the door to muffle the noise. Jane told defendant that he had to let her go, that she did not want to be back together and that she would have to call the police. He then knocked her to the ground and climbed onto her back. He pinched her nose, covered her mouth, and bit her cheek. She had trouble breathing, which only got worse when her nose started bleeding. Defendant wiped blood from his hands on her face; he then appeared to panic as he wiped up the blood from the floor. The two sat on the couch. Jane tried to reach behind her to remove the safety latch from her pepper spray, but when defendant saw what she was doing he became "really angry" and took it away from her, saying "I should use it on you."

Defendant then suggested that Jane take a shower with him downstairs. She declined; taking a shower with defendant felt "too personal" if they weren't a couple, and she "didn't want to be a couple." Defendant told her to accompany him anyway while he showered so that she would not leave. She even suggested meeting him downstairs while she went to the bathroom, but instead he went with her and waited outside the door while she used it. Jane did not try to leave while he was in the shower; he still had her identification, bus pass, and cell phone, and given their history, she was afraid to run away. On the way back to defendant's room she saw someone she recognized but did not know. Remembering that no one had responded before when she yelled for help, she remained quiet.

9

While in defendant's room he again got upset because Jane had been talking to her friends after he told her not to continue those friendships. He threw Jane's phone against the wall, breaking it. He then told her to take off her clothes and get into the bed. She told him she would get in the bed but would keep her clothes on because she was cold. She did not add the reason that she did not feel comfortable with him. She did take them off but left her underwear on and put on a T-shirt that she found on the floor. At this point her face was sore, she had a bruise on her upper arm, and she had a "big headache." The blood defendant had smeared on her face had been cleaned off.

Defendant began kissing Jane, and he protested when she did not kiss him back. Reluctantly, out of fear that he would start hitting her again, she stroked his back. Defendant "helped" her take off her underwear and then had sexual intercourse with her. During the act, defendant asked Jane if "this was okay," and she said it was "fine" or "okay." Jane did not want to have sex with defendant, but she was afraid if she said no then he would hit her. As she explained at trial, "[H]e had been hitting me since he picked me up, and it was continuous hitting and yelling. So it was—and he had never made me bleed before, and so to me that was like an escalation. And I just didn't know how [much] further it would escalate." At the same time she felt "guilty" that she did not say no, because she "didn't want to do it" and should have said so.

Defendant was calm the rest of the night, and Jane fell asleep. She had not tried to leave before then because defendant was on the side of the bed closer to the door, and he would have stopped her if he had woken up as she tried to leave. The next morning, defendant began to initiate sex by kissing her, but he stopped when she said she did not want to continue.

As he prepared to drive her home the morning of May 26, defendant told Jane to leave her belongings in his room so she would meet up with him later. When he dropped her off, he told her he would pick her up at 2:00 p.m.; she said "Yeah, sure. That's fine." Defendant then asked for a kiss; she gave him a small kiss on the cheek, but he insisted

10

on a "real kiss" before he let her leave.  Jane had managed to retrieve her phone when he was not looking, but her identification and other cards were still in defendant's possession.

At home she called the non-emergency number for the police to find out how to obtain a temporary restraining order against defendant.  She felt guilty because she did not want to get defendant in trouble, but she also realized that her past efforts to protect him and yet move on had not worked, so this was her "last resort."  During the police interview, she said "no" in answer to the question whether there had been a sexual assault.  At the police station later, she said they had had consensual sex; she thought it was consensual because she had not said no or put up a struggle.  She thought that if she did not fight back then it was not "fair for someone to get in trouble."

These events of May 25, 2012 led to the remaining charges:  count 8, battery (not challenged on appeal); count 9, assault by means likely to produce great bodily injury; count 10, false imprisonment by violence; count 11, kidnapping; and count 12, forcible rape.

*Procedural Background*

Defendant was originally charged in two separate accusatory pleadings, the first pertaining to the events of May 25, 2012 and the second pertaining to the events from November 9, 2010 to May 25, 2012.  In September 2012 the People moved to consolidate the pleadings, while defendant moved to sever the two cases.  The court denied defendant's motion and granted the People's motion, and the charges were then combined into a single amended information accusing defendant of 12 counts:  count 1, grand theft from the person arising from the November 9, 2010 ATM incident (Pen. Code, § 487, subd. (c)) [4] ; count 2, false imprisonment by violence on January 6, 2011

---

[4]  All further statutory references are to the Penal Code except as otherwise indicated.

11

(§§ 236, 237); count 3, stalking between January 19, 2011 and May 25, 2012 (§ 646.9, subd. (a)); count 4, false imprisonment by violence on February 3, 2011; count 5, corporal injury on a former cohabitant on November 12, 2011 (§ 273.5, subd. (a), a misdemeanor); count 6, attempted criminal threat on November 13, 2011 (§§ 422, 664); count 7, disobeying a court order, the restraining order procured by Samantha and Emma (§ 166, subd. (a)(4), a misdemeanor); count 8, misdemeanor battery on May 25, 2012 (§ 243, subd. (e)(1)); count 9, assault by means likely to produce great bodily injury on May 25, 2012 (§ 245, subd. (a)(1)); count 10, false imprisonment by violence between May 25 and May 26, 2012 (§ 236); count 11, kidnapping on May 25, 2012 (§ 207, subd. (a)); and count 12, forcible rape on May 25, 2012 (§ 261, subd. (a)(2)).

Jane testified at length about the history of her relationship with defendant. Also testifying for the prosecution were four of Jane's friends. Spencer and James had responded to Jane's distress call on November 9, 2010, and they had been present on November 13, 2011 when defendant pounded on the door and windows of Jane's apartment and threatened to kill her. Both James and Samantha related encounters with defendant while they were accompanying her to various places on campus for her safety; defendant would yell at Jane, "calling her a bitch and saying she was stupid" and demanding that she come with him to talk. James and Samantha also described the bruises they had seen on Jane's arms.[5] The woman in the van, whom Jane had seen as defendant was driving her toward Watsonville, testified about defendant's hitting Jane several times both before and after Jane signaled her for help. Emma related the events of May 7, 2012, in particular defendant's "violent knocking" and banging on the windows of their apartment in violation of the restraining order she and Samantha had

---

[5] The jury was also shown photos of the bruises Jane had suffered on her arm and face on May 25, 2012.

12

obtained the previous December. Emma also described Jane's appearance when she returned to the apartment the morning of May 26, 2012; she was sobbing and terrified, and she had "horrible" bruises on her, worse than those Emma had seen on Jane before. During the ensuing interview with the police officer at the apartment, Jane was "distraught." Among the other witnesses was "Dee" O'Brien, who testified as an expert on the subject of "intimate partner battering." The defense presented Valerie Ross, defendant's friend, who described him as "funny, really sweet, loyal, [and] [a]lways trustworthy," and who steadfastly disbelieved the allegations against him.

The jury heard testimony between September 26 and October 9, 2013. On October 11, 2013, after deliberating for a day and a half, the jury reached a verdict of guilty on all counts except count 1, the grand theft charge, on which they were deadlocked. The court declared a mistrial on that count and it was dismissed in the interest of justice. Defendant was thereafter sentenced to a total of eight years, eight months in prison for his conviction on the remaining 11 counts.

*Discussion*

1. *Sufficiency of the Evidence*

Most of defendant's argument on appeal is devoted to his assertion that the evidence is insufficient to support the verdict on eight of his 11 convictions: the three false imprisonment counts, corporal injury on a former cohabitant, attempted criminal threat, kidnapping, assault by means likely to produce great bodily injury, and rape. He acknowledges our standard of review. "The role of an appellate court in reviewing the sufficiency of the evidence is limited. The court must 'review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.]" (*People v. Ceja* (1993) 4 Cal.4th 1134, 1138.) "We must presume in support of the judgment the existence of every fact that the trier of fact could reasonably

13

deduce from the evidence." (*People v. Medina* (2009) 46 Cal.4th 913, 919.)  Reversal is "unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].'  [Citation.]"  (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)  "Given this court's limited role on appeal, defendant bears an enormous burden in claiming there was insufficient evidence to sustain his conviction[s]."  (*People v. Sanchez* (2003) 113 Cal.App.4th 325, 330.)

With this standard in mind, we consider each of the contested counts in turn.

a.  *False Imprisonment by Violence*

"False imprisonment is the unlawful violation of the personal liberty of another." (§ 236.)  The essence of the crime of false imprisonment is restraint of the person. " 'Any exercise of force, or express or implied threat of force, by which in fact the other person is deprived of his liberty or is compelled to remain where he does not wish to remain, or to go where he does not wish to go, is an imprisonment.  The wrong may be committed by acts or by words, or both, and by merely operating upon the will of the individual or by personal violence, or both. . . .  If an act is done with the intention of causing the confinement of the person actually confined or of another and such act is a substantial factor in bringing about a confinement, it is immaterial whether the act directly or indirectly causes the confinement.' " (*People v. Agnew* (1940) 16 Cal.2d 655, 659-660.)

For false imprisonment to constitute a felony, it must be accomplished through violence, menace, fraud or deceit.  (§ 237.)  In the case of violence, the crime becomes a felony when "the force used is greater than that reasonably necessary to effect the restraint." (*People v. Hendrix* (1992) 8 Cal.App.4th 1458, 1462; *People v. Castro* (2006) 138 Cal.App.4th 137, 140.)  " 'Menace' is defined as ' " 'a threat of harm express or implied by word or act.' " ' [Citation.]"  (*People v. Reed* (2000) 78 Cal.App.4th 274, 280.)

14

Defendant contends that there was insufficient force on each of the charged occasions to rise to the level of a felony on all of the three occasions. He cannot succeed. Count 2 pertained to the incident on January 6, 2011, when defendant detained Jane as she was walking to class. He forcefully grabbed her arm, pinching it, and led her off behind the building. He yelled at Jane and then led her further into a secluded part of the woods. When she tried to get away from him, he grabbed her arm, at times "pretty forceful because there w[ere] a couple of times when [she] got knocked down." During this incident Jane was crying, and with the shoes she was wearing she was was unable "to make a run for it." Only when the bicyclist came to her aid was Jane released. There can be no question that defendant used force above what was necessary for misdemeanor false imprisonment. (See, e.g., *People v. Castro*, *supra*, 138 Cal.App.4th at p. 143 [grabbing victim and pulling her toward defendant's car amounted to sufficient force to elevate conduct to a felony].)

Count 4 pertained to February 3, 2011, when defendant accosted Jane as she read her debate notes on the way to class. Defendant did not, as he represents on appeal, merely snatch the paper from her hands and leave with it. Notwithstanding the no-contact agreement, defendant also grabbed her arm and pulled her behind a building, while ordering her to "do something" to prevent him from getting kicked out of school. Defendant's conduct was sufficient to constitute at least menace, if not violence.

Count 10 took place on May 25, 2012, when defendant kept Jane confined in his room. Defendant offers one sentence suggesting that there was no false imprisonment at all because Jane had "multiple opportunities to leave or escape." He discounts the "physical violence" as related only to the "break-up of the relationship and not to restraint of movement." Defendant's position is beyond absurd. Whatever the reason for his being upset, his conduct unquestionably constituted false imprisonment with violence. After he locked the door to his room, Jane told him he had to let her go, that she did not want to be back together and that she would have to call the police. He immediately

15

knocked her to the ground, climbed onto her back, pinched her nose, covered her mouth, and bit her cheek. It is inconceivable that any rational juror would consider these acts as anything less than false imprisonment with violence. Substantial evidence clearly supports the jury's verdict as to each of the felony false imprisonment counts.

   b. *Corporal Injury on a Former Cohabitant*

   Defendant's challenge to count 5 is equally meritless. He acknowledges that on November 12, 2011, while blaming Jane for his car accident, he began slapping Jane in the face, shoving her against the wall, and pushing her up the stairs, leaving her with bruises on her arms. This "physicality" only increased when Jane said that this was "not okay" and she wanted to break up. Defendant's point is that Jane was not a cohabitant when these acts occurred. He has failed, however, to acknowledge the facts or the law.[6] Defendant was charged with corporal injury on a *former* cohabitant, and the court instructed the jury accordingly. Defendant does not suggest that Jane was not a former cohabitant, having spent an average of five nights a week, including dinners, at defendant's residence during the previous summer. To commit this crime within the meaning of section 273.5 the defendant need not live with the victim continuously for the victim to qualify as a cohabitant.[7] "The element of 'permanence' in the definition refers

---

[6] Section 273.5 states: "(a) Any person who willfully inflicts corporal injury resulting in a traumatic condition upon a victim described in subdivision (b) is guilty of a felony, and upon conviction thereof shall be punished by imprisonment in the state prison for two, three, or four years, or in a county jail for not more than one year, or by a fine of up to six thousand dollars ($6,000), or by both that fine and imprisonment. [¶] (b) Subdivision (a) shall apply if the victim is or was one or more of the following: [¶] (1) The offender's spouse or former spouse. [¶] (2) The offender's cohabitant or former cohabitant. [¶] (3) The offender's fiancé or fiancée, or someone with whom the offender has, or previously had, an engagement or dating relationship, as defined in paragraph (10) of subdivision (f) of Section 243. . . ."

[7] Of course, defendant was guilty of this crime by virtue of the "dating relationship" between him and Jane, within the meaning of section 273.5, subdivision (b)(3) and (continued)

16

only to the underlying 'substantial relationship,' not to the actual living arrangement." (*People v. Moore* (1996) 44 Cal.App.4th 1323, 1334.) Cohabitation can be found even in "unstable or transitory" living conditions. (*People v. Taylor* (2004) 118 Cal.App.4th 11, 19.) Nor does defendant suggest that the bruises he left on Jane did not constitute a "traumatic condition" within the meaning of the statute. The jury properly reached a verdict of guilty on this misdemeanor count.

 c. *Attempted Criminal Threat on November 13, 2011*

 Defendant makes the same mistake regarding count 6 as in count 5, by misrepresenting the charge. His entire argument is that he did not make a criminal threat within the meaning of section 422, because "no one took the threat of 'killing' seriously," making it no more than an "angry, emotional outburst." Jane herself, he adds, "gave the alleged threat no credence whatsoever, by her act of speaking on behalf of [defendant] at the restraining order hearing." The charge, however, was *attempted* criminal threat. While "ramming the door" with his body weight and violently banging on the windows of Jane's apartment defendant repeatedly yelled, "[Jane Doe], I'm going to fucking kill you." Defendant misstates the record when he claims that no one took the threat seriously; Spencer testified that he was "fearful for [Jane's] safety," and James described it as a "really scary situation" which made him "terrified for [Jane's] safety." A conviction for attempted criminal threat requires "proof that the defendant had a subjective intent to threaten *and* that the intended threat under the circumstances was sufficient to cause a reasonable person to be in sustained fear." (*People v. Chandler* (2014) 60 Cal.4th 508, 525.) The jury properly inferred that defendant had a "subjective intent to threaten," and the testimony of Spencer and James supported the finding that in

---

section 243, subdivision (f). But it does not appear that the court instructed the jury on this condition.

17

the circumstances presented, where the two men had to brace themselves against the door while Samantha called 911, the intended threat was sufficient to cause a reasonable person to be in sustained fear. That Jane did not hear defendant's threat merely made his crime an attempted criminal threat.[8] (See *People v. Toledo* (2001) 26 Cal.4th 221, 235 [direct threat which "reasonably could have caused [the victim] to be in sustained fear" but which the person does not understand, or which fails to cause the victim to be in sustained fear, can be an attempted threat].) Defendant was properly convicted of this offense.

      d. *Kidnapping*

Kidnapping, the crime charged in count 11, occurs when a person "forcibly, or by any other means of instilling fear, steals or takes, or holds, detains, or arrests any person in this state, and carries the person into another country, state, or county, or into another part of the same county." (§ 207, subd. (a).) In order to prove the kidnapping of Jane under this provision, the prosecution had to prove that she was moved for a substantial distance by use of force or fear, without her consent. (*People v. Bell* (2009) 179 Cal.App.4th 428, 435; accord, *People v. Arias* (2011) 193 Cal.App.4th 1428, 1434.)

Defendant reaches far into the realm of the farfetched in arguing that no kidnapping occurred on May 25, 2012. In his implausible view, Jane was not kidnapped because defendant only slightly grabbed her wrist as he pulled alongside her and angrily ordered her to "get in the fucking truck now." Defendant ignores the law. "The force used against the victim 'need not be physical.' [Citation.] It is settled [that] 'movement is forcible where it is accomplished through the giving of orders which the victim feels compelled to obey because he or she fears harm or injury from the accused and such apprehension is not unreasonable under the circumstances.' " (*People v. Galvan* (1986)

---

[8] Defendant does not take issue with the court's instruction on this crime.

187 Cal.App.3d 1205, 1213, quoting *People v. Stephenson* (1974) 10 Cal.3d 652, 660, disapproved on other grounds in *People v. Pope* (1979) 23 Cal.3d 412, 426.)

Defendant also tries to discredit Jane's testimony. He admits that Jane was scared, but he suggests that her testimony to that effect was only a "legal conclusion without supporting facts." Defendant does not explain how a witness can support her testimony about her emotion on a particular day with anything other than the simple factual statement of how she felt: scared.

Defendant further suggests that Jane only made a "bad choice" when she got into defendant's truck. He completely ignores the circumstances surrounding his demand, including not only the immediate demand but the entire history of his abusive behavior toward her. Moreover, even if by some extension of reality Jane could be said to have voluntarily complied with defendant's demand, there can be no question that as he continued driving toward Watsonville she was being transported against her will. Twice she tried to get out of the truck at stop signs, she made multiple attempts to solicit help from nearby drivers, she even hit him with her shoe. Instead of releasing her, of course, defendant continued driving while yelling at her, hitting her on the arm and face, and pulling her back toward the center whenever she tried to escape. Jane clearly stated at trial that she did not want to be in the truck with defendant.

Defendant's argument is even weaker than that of the defendant in *People v. Camden* (1976) 16 Cal.3d 808, 812, who unsuccessfully urged that the evidence was insufficient to support his conviction of kidnapping because the victim entered the car voluntarily. Like Jane, the victim in *Camden* tried to escape from the vehicle but defendant used force to restrain her. Likewise, in *People v. Hovarter* (2008) 44 Cal.4th 983, 1017 the court noted that the victim's voluntary entry into defendant's truck "does not necessarily negate the existence of a kidnapping. 'Even if the victim's initial cooperation is obtained without force or the threat of force, kidnap[p]ing occurs if the accused " 'subsequently restrains his victim's liberty by force and compels the victim to

19

accompany him further.' " ' [Citation.]" (See also *People v. Galvan*, *supra*, 187 Cal.App.3d at pp. 1214-1215 [kidnapping conviction upheld where the victim, although initially entering the vehicle voluntarily, could not have extricated herself from the moving vehicle].) How defendant's conduct in this case could be deemed anything other than kidnapping defies reason.

e. *Assault by Means Likely to Produce Great Bodily Injury*

In count 9 the People charged defendant with a violation of section 245, subdivision (a)(4),[9] which prescribes the penalty for committing "an assault upon the person of another by any means of force likely to produce great bodily injury." "Great bodily injury," as that phrase is used in section 245, means "bodily injury which is significant or substantial, not insignificant, trivial or moderate." (*People v. McDaniel* (2008) 159 Cal.App.4th 736, 748 (*McDaniel*).) "The force likely to produce bodily injury can be found where the attack is made by use of hands or fists." (*Ibid*; see also *People v. Aguilar* (1997) 16 Cal.4th 1023, 1028 ["That the use of hands or fists alone may support a conviction of assault 'by means of force likely to produce great bodily injury' is well established"].) However, neither physical contact nor actual injury is a required element of this offense. " ' "The issue, therefore, is not whether serious injury was caused, but whether the force used was such as it would be likely to cause it." ' " (*McDaniel*, *supra*, at p. 748.) Whether it was sufficient to cause great bodily injury depends on "the force of the impact, the manner in which it was used and the circumstances under which the force was applied." (*Id.* at pp. 748-749.) [This question, however, is "for the trier of fact to decide." (*People v. Sargent* (1999) 19 Cal.4th 1206, 1221.)

---

[9] The information identified subdivision (a)(1) of section 245, but the text of this charge, the jury instructions, and the prosecutor's argument described assault by means of force likely to produce great bodily injury, which is the subject of subdivision (a)(4).

20

In his argument to the jury the prosecutor focused on the events inside defendant's room on May 25, after returning from the drive to Watsonville. When Jane told defendant that she did not want to be back together and that she would have to call the police, he knocked her to the ground and climbed onto her back. He pinched her nose, covered her mouth, and bit her cheek. She had trouble breathing, which only got worse when her nose started bleeding. Defendant makes no effort to convince us that this was not force likely to produce great bodily injury beyond the bare assertion that "strik[ing] [Jane] with sufficient force to cause her a bloody nose" was not force sufficient to cause great bodily injury.[10] The jury performed its duty in determining that striking Jane with enough force to knock her down, closing off the air supply to her nose and mouth, and giving her a bloody nose in the process constituted force likely to produce great bodily injury.

   f. *Rape*

Forcible rape, the charge in count 12, is defined as "an act of sexual intercourse accomplished with a person not the spouse of the perpetrator," which is against that person's will "by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another." (§ 261, subd. (a)(2).) Defendant does complain that the jury was erroneously instructed on the elements of and defenses to this crime. He addresses the "force" element only indirectly, by contending that "the record is replete with evidence that on the night in question, May 25, 2012, [Jane] "consent[ed] to have sex with [defendant]."

Consent, an element of rape, is defined in section 261.6 as "positive cooperation in act or attitude pursuant to an exercise of free will. The person must act freely and

---

[10] For this reason it is unnecessary to address defendant's assertion that he is instead "guilty of the lesser included offense of battery."

voluntarily and have knowledge of the nature of the act or transaction involved. [¶] A current or previous dating or marital relationship shall not be sufficient to constitute consent where consent is at issue in a prosecution under Section 261 . . . ."

Defendant asserts that the two were having "make-up" sex that night, a typical feature of their relationship. Jane's consent, he believes, was manifested by the "quietude" preceding the act of sexual intercourse, her cooperation in stroking his back, and her affirmative response when he asked if it was okay to continue. After all, Jane acknowledged during cross-examination that she had told the investigating officers that he had not sexually assaulted her and that when defendant asked if she wanted him to stop, she had answered "No, it's okay." Thus, in defendant's view, Jane "confesse[d] to doing something that she did not want to do but consent[ed], nevertheless, to doing it." The jury must have "erroneously equat[ed] not wanting to do something, with not consenting to doing it. Here, [Jane] might not have wanted to have sex, but . . . it is abundantly clear that she consent[ed] to the act. One might not want to go to work, but consents to doing so anyway for whatever reasons are personal and pertinent to the situation."

Defendant's reasoning, which amounts to "not saying no means yes," is inconsistent with the law as it has existed for decades. Since its amendment in 1980 section 261 has not required resistance by the victim for a rape to be committed. (See *People v. Barnes* (1986) 42 Cal.3d 284, 297-298, 302-303.) And even before the amendment, "it had long been the rule that the resistance required by former section 261, subdivision 2, was only that which would reasonably manifest refusal to consent to the act of sexual intercourse." (*Id.* at p. 297; *People v. Story* (2009) 45 Cal.4th 1282, 1300.)

Defendant's argument also distorts the facts. During her testimony Jane clearly stated that she did not want to have sexual intercourse with defendant that day. The sexual intercourse that took place on May 25, 2012 was different from the times they had been intimate in the past. On this occasion, she said, "I only engaged after being told that

22

I needed to engage." She complied because she was afraid that if she said no, he would hit her, and she "didn't want to get hit anymore." When interviewed by the investigating officers, she stated that she had not been sexually assaulted because she had not said no or fought back. Evidently Jane was under the same misconception that defendant still holds on appeal. The jurors, however, were not under any such illusion. They were properly instructed that "[t]o consent, a woman must act freely and voluntarily and know the nature of the act. Evidence that the defendant and the woman dated is not enough by itself to constitute consent."

That Jane submitted out of fear was sufficient to constitute lack of consent. "Actual consent must be distinguished from submission. For instance, a victim's decision to submit to an attacker's sexual demands out of fear of bodily injury is not consent [citations] because the decision is not freely and voluntarily made (§ 261.6). A selection by the victim of the lesser of two evils—rape versus the violence threatened by the attacker if the victim resists—is hardly an exercise of free will." (*People v. Giardino* (2000) 82 Cal.App.4th 454, 460, fn 3; see also *People v. Lay* (1944) 66 Cal.App.2d 889, 893 ["Submission induced by the fear specified in the code is not consent"].)

The jury was fully instructed not only on the definition of consent, but also on the concepts of force, menace, duress, and a perpetrator's reasonable belief in the victim's consent. The prosecutor urged the jury to regard this case as one involving "primarily" duress, menace, and fear of immediate bodily injury, any of which were concepts on which the jury could easily have relied in reaching its verdict.[11]

---

[11] "Duress" was defined for the jury as "a direct or implied threat of force, violence, danger or retribution that would cause a reasonable person to do or submit to something that she would not do or submit to otherwise. When deciding whether the act was accomplished by duress, consider all the circumstances, including the woman's age and her relationship to the defendant." "Menace" was defined as "a threat, statement or act showing an intent to injure someone." Finally, the jury was told that "[i]ntercourse is (continued)

23

As he does in addressing each of the challenged counts, defendant essentially urges this court to reweigh the evidence on the rape charge. This we may not do. "It is of no consequence that the jury believing other evidence, or drawing different inferences, might have reached a contrary conclusion." (*People v. Brown* (1984) 150 Cal.App.3d 968, 970.) Nor is it our duty to overturn the verdict merely because we might have reached a different conclusion from the facts. "A reviewing court neither reweighs evidence nor reevaluates a witness's credibility." (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.) "[I]t is the *jury*, not the appellate court, which must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.] Therefore, an appellate court may not substitute its judgment for that of the jury. If the circumstances reasonably justify the jury's findings, the reviewing court may not reverse the judgment merely because it believes that the circumstances might also support a contrary finding." (*People v. Ceja*, *supra*, 4 Cal.4th at p. 1139; *People v. Wallace* (2008) 44 Cal.4th 1032, 1077; *People v. Albillar* (2010) 51 Cal.4th 47, 60.) Thus, "[i]f the circumstances reasonably justify the verdict of the jury, the opinion of the reviewing court that those circumstances might also reasonably be reconciled with the innocence of the defendant will not warrant interference with the determination of the jury." (*People v. Newland* (1940) 15 Cal.2d 678, 681.)

In accordance with these settled precepts, it was for the jury to accept or reject Jane's testimony that defendant had sexual intercourse with her against her will and by the use of force, duress, menace, or fear. That we might interpret the evidence differently is immaterial. Because Jane's testimony, considered in light of the entire history of her

---

accomplished by fear if the woman is actually and reasonably afraid or she is actually but unreasonably afraid but the defendant knows of her fear and takes advantage of it."

relationship with defendant, provides substantial evidence to support the conviction on this count, reversal is not required.

2. *Motion to Sever*

At the hearing on defendant's motion to sever counts 8 through 12, defense counsel argued that all of the charges pertaining to the events of May 25, 2012 should be tried separately from those "less explosive charges" relating to the prior dates, in order to prevent the kind of prejudice that could result from consolidation. Counsel particularly urged the court to find that the rape charge was "very likely to inflame the jury" and that it was weak compared to the "other cases."

The court considered the motion under section 954, which permits joinder of offenses "connected together in their commission."[12] Joinder is favored because "trial of the counts together ordinarily avoids the increased expenditure of funds and judicial resources which may result if the charges were to be tried in two or more separate trials." (*People v. Bean* (1988) 46 Cal.3d 919, 936; *People v. Lucas* (2014) 60 Cal.4th 153, 214 (*Lucas*).) Thus, "because consolidation or joinder of charged offenses ordinarily promotes efficiency, that is the course of action preferred by the law." (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1220.)

---

[12] This statute provides, in relevant part: "An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts, and if two or more accusatory pleadings are filed in such cases in the same court, the court may order them to be consolidated. The prosecution is not required to elect between the different offenses or counts set forth in the accusatory pleading, but the defendant may be convicted of any number of the offenses charged, and each offense of which the defendant is convicted must be stated in the verdict or the finding of the court; provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately."

"A ruling on a motion to sever is based on a weighing of the probative value of any cross-admissible evidence against the prejudicial effect of evidence the jury would not otherwise hear, but in the weighing process the beneficial results of joinder are added to the probative value side. Therefore a defendant seeking severance must make an even stronger showing of prejudicial effect than would be required in determining whether to admit other-crimes evidence in a severed trial." (*People v. Bean*, *supra*, 46 Cal.3d at p. 936.)

On appeal, "it is the defendant's burden to show error in allowing a joint trial of the charged offenses and relief will obtain only on a clear showing of prejudice to establish the trial court's abuse of discretion." (*Lucas*, *supra*, 60 Cal.4th at p. 214.) "Refusal to sever may be an abuse of discretion where: (1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a 'weak' case has been joined with a 'strong' case, or with another 'weak' case, so that the 'spillover' effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges; and (4) any one of the charges carries the death penalty or joinder of them turns the matter into a capital case." (*People v. Sandoval* (1992) 4 Cal.4th 155, 172-173.) The Supreme Court has clarified, however, that "the criteria enumerated in *Sandoval* are not equally significant. '[T]he first step in assessing whether a combined trial [would have been] prejudicial is to determine whether evidence on each of the joined charges would have been admissible, under Evidence Code section 1101, in separate trials on the others. If so, any inference of prejudice is dispelled.' [Citations.]" (*People v. Bradford* (1997) 15 Cal.4th 1229, 1315-1316; *Lucas*, *supra*, at p. 214.)

On appeal, defendant addresses only the third *Sandoval* criterion, contending that "the rape and its related charges are different from the rest of the case," because they occurred on the same date, whereas "[a]ll the other charges, involving the stalking, threats [*sic*], false imprisonment, theft, and disobeying of a court order are separate

26

events that transpire[d] over a two[-year] period, and, are by comparison, not of equal severity to the kidnap and rape charges. [¶] . . . [B]y taking more easily proven charges, occurring over an expanse of time (Counts 1 through 8), the 'spillover' effect is to make it easier to convict on the more severe charges."

Notably, defendant does not address the cross-admissibility criterion, and we treat that omission as conceding that the charges in the two cases were cross-admissible. Adverting to the point made in *People v. Bradford*, *supra*, 15 Cal.4th at pp. 1315-1316 and reinforced by *People v. Lucas*, *supra*, 60 Cal.4th at p. 60, we conclude that the cross-admissibility of the evidence pertaining to the different charges is dispositive of the issue. No prejudice has been established resulting from the joint trial of the charges, and thus no abuse of discretion occurred in the court's decision to deny defendant's severance motion.

*Disposition*

The judgment is affirmed.

_____

ELIA, J.

WE CONCUR:


_____

RUSHING, P. J.


_____

PREMO, J.